**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**


IN THE MATTER OF
JOSELUIS SAENZ,

        Claimant.                 No. 99-21M


## MEMORANDUM  OPINION
## AND  ORDER

     This case comes up pursuant to Fed R Crim P. 41(e) on the Claimant's Motion for Return of Property Seized by Search Warrant. The United States holds eagle feathers and related items taken from the Claimant's home in 1996 pursuant to a valid warrant; and the Claimant, Joseluis Saenz, seeks immediate return of all that was seized. Saenz has no permit to possess eagle feathers and the United States Fish and Wildlife Service insists that without a permit, possession of eagle feathers violates the Bald and Golden Eagle Protection Act, 16 U.S.C. sec. 668 *et seq,* and requires confiscation and forfeiture.

     Saenz states, first, that he is an American Indian legally entitled to possess eagle feathers because he uses them exclusively to practice a Native American religion; secondly, that eagle feathers are essential to the free exercise of his religion; thirdly, that the government unreasonably refuses to issue him an eagle feather permit; and finally, that confiscation of his eagle feathers constitutes an unjustifiable burden on the free exercise of his religion and violates the Religious Freedom Restoration Act, 42 U.S.C. sec. 2000bb-2000bb-4.

     I resolve all issues in favor of the Claimant. I discuss none of the constitutional questions

presented by the parties because I ground my conclusions in the Religious Freedom Restoration Act and the Bald and Golden Eagle Protection Act, and therefore have no need to address constitutional issues.

Defendant's Motion Regarding Procedure

I have considered the United States' Motion to Treat the Claimant's Rule 41 Motion as a Civil Complaint, but I find what Defendant proposes unnecessary and time-consuming. I am satisfied that both sides of this controversy have had a fair opportunity to speak fully to all of the issues and expanding the process to follow the more common complaint-answer-discovery format serves no purpose.

Rule 41(e) and general equitable jurisdiction provide adequate basis for consideration of this case in its entirety and for granting the relief requested. Frazee v. Internal Revenue Service, 947 F.2d 448 (10th Cir. 1991); United States v. Madden, 95 F.3d 38 (10th Cir. 1996). Because there are no criminal proceedings pending against Saenz and the property at issue was neither seized by judicial mandate nor properly the subject of administrative forfeiture proceedings, the motion can be construed as "an independent civil action based on equitable principles;" Id. at 39; Floyd v. United States, 860 F.2d 999, 1005 (10th Cir.1988). Rule 41(e) is not only available, but also completely sufficient to invoke jurisdiction. Id. There exists no good reason to convert the Rule 41(e) petition into a more cumbersome process; and the Defendant's motion is denied.

Jurisdiction

Equitable jurisdiction pursuant to Fed.R.Crim.P. 41(e) is dependent, first, on Saenz' showing the absence of a remedy at law, and second, on his establishing the threat of irreparable injury. Frazee v. Internal Revenue Service, supra at 449; Floyd v. United States, supra at 1002-1003. Saenz convincingly demonstrates both jurisdictional requisites.

## A. Adequate Remedy at Law

The government contests the conclusion that Saenz has no adequate remedy at law because for the second time, the Fish and Wildlife Service (FWS), an agency of the United States Department of the Interior, has initiated an administrative forfeiture proceeding. In 1998, FWS obtained an administrative order providing for permanent forfeiture of some of the items seized from Saenz' home, but this order is unenforceable because the agency cannot support its proceeding with any indicia of due process. Thus, in order to repair the initial forfeiture and to include all of the items seized, FWS re-filed a Notice of Proposed Forfeiture on August 31,1999, approximately a month after this case was filed. The government now takes the position that the second forfeiture proceeding provides Saenz an adequate remedy at law.

I conclude that it does not. Both issuance of eagle permits and forfeiture absent a permit rest with the discretion of the Secretary of the Department of the Interior. 16 U.S.C. sec. 6668a; 50 C.F.R. sec. 22.22. An agency action resting on discretion does not constitute an adequate remedy at law. Floyd v. United States, supra at l004. Further, I consider the pending forfeiture proceeding a formality that provides no real opportunity for Saenz to be heard.

Due process in administrative forfeitures means the same as it does in any other context: "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." United States v. Deninno, 103 F.3d 82, 85 (10th Cir. 1996). Evaluation of both administrative proceedings as they pertain to this case is proper. "District courts have jurisdiction to entertain collateral due process attacks on administrative forfeitures." Id. at 84. Therefore, I conclude that both administrative forfeiture proceedings, whether taken separately or together, fail as a fair and just resolution of this case.

The first administrative forfeiture fails for lack of notice. Official FWS records indicate Saenz received no notice of forfeiture in 1997 or 1998. In March of 1997, FWS sent Saenz a notice of violation of the Bald and Golden Eagle Protection Act (BGEPA) and a demand for payment of a fine. This notice was sent to Post Office Box 837, Santa Clara, New Mexico, which was Saenz' correct address at the time, and Saenz responded to the notice. Although the charge was later dismissed on the government's motion, the government did not return the seized eagle feathers to Saenz. Instead, FWS sent Saenz a Notice of Proposed Forfeiture. This notice, however, was sent to 125 Cody Lane, Santa Clara, New Mexico. This was not a correct address; and when the postal service returned Saenz' notice to FWS marked "undeliverable," the agency made no attempt to resend the notice to the proper address which, of course, it had in its file.

Even though the notice purportedly sent to Saenz was not sent to a place where FWS could reasonably calculate Saenz would receive it, the agency proceeded with its forfeiture and obtained an administrative order. This order is void for lack of due process, and without a forfeiture order, the United States is left without a valid basis for retaining the eagle feathers at issue.

In addition, under any set of facts, the pending administrative proceeding will not provide Saenz real opportunity to object to forfeiture or to present a legal claim of entitlement. The United States has already decided Saenz is not an Indian and all of what he claims or intends to present to the contrary has been declared immaterial by federal regulation.

The government will consider no evidence or argument on Saenz' right to possess eagle feathers without his first providing a government-issued identification which declares him to be an enrolled member of a federally-recognized Indian tribe. 50 C.F.R. sec. 22.22(a)(5). This Saenz cannot provide. There exists, then, no way for Saenz to present to FWS a legal right to the seized

property, the essential nature of the seized eagle feathers to his religious practices or the authenticity of his Indian heritage. In other words, because Saenz does not have the sole piece of evidence the United States government accepts as proof of ancestry in "an Indian tribe," claims before the administrative agency pursuant to the Bald and Golden Eagle Protection Act or the Religious Freedom Restoration Act are absolutely foreclosed by the agency's prior position, made binding by federal regulation. There is nothing Saenz can put before FWS that the agency will find worthy of its consideration or pertinent to whether or not Saenz should have a permit to possess eagle feathers. Should the case proceed to an administrative forfeiture hearing, there would be no point in Saenz appearing.

Dismissal of a judicial action based on the existence of a pending administrative proceeding initiated after the case was filed is entirely in my discretion. Frazee v. Internal Revenue Service, supra at 450. In this case, considering all the circumstances and the conclusions already reached by FWS, I find the exercise of equitable jurisdiction clearly warranted. In addition to the restricted nature of the administrative process, I find inexcusable delay on the part of the agency in bringing a proper forfeiture action, unreasonableness on the part of the agency in retaining the eagle feathers without a proper and legal forfeiture proceeding, and finally, grave harm to Saenz should this action not be heard. I see none of the traditional reasons for deferring an issue to an administrative agency; and I note it highly likely that the filing of the second Notice of Proposed Forfeiture was prompted solely by the filing of this case and not by any desire on the part of FWS to provide Saenz with a fair, prompt and legal process. This all leads me to conclude that justice cannot be better served by remission of the case to the Department of the Interior and that the interests of justice require it be brought to its end by a judicial process.

## B. Irreparable Injury

Saenz is a 42 year-old self-employed American citizen who presently resides in Santa Clara, New Mexico. He is an American Indian whose ancestors belonged to the Chiricahua Apache tribe, Chokonen Band, and he follows the beliefs and traditions of the Chiricahua Apache religion. Saenz is a sincere practitioner of that religion, and for a substantial part of his life, he has been a religious ceremonial dancer. He has traveled North America as a regular participant in native religious events and intertribal dances and is recognized in the community with which he associates and in other native communities as a religious dancer.

The United States refuses to acknowledge Saenz' Native American ancestry. It has not granted all Native American tribes the same political standing and has never acknowledged the Chiricahua Apache either as a separate sovereign or an authentic tribal group. Insofar as any Chiricahua have been recognized by the federal government as genuinely American Indian, they have been included as members of other Apache tribes which are currently residing on federal reservations in Oklahoma and New Mexico.

In 1886, when Cochise and several bands of Apache surrendered to the United States to be exiled to Florida, the Chiricahua did not. Instead, the Chiricahua fled to Mexico. Twenty years later, the United States freed those imprisoned in Florida and moved them to reservations in Oklahoma and New Mexico. At that time, the federal government recognized these Apache as independent tribes, eventually placing them on the government's list of independent political entities entitled to a sovereign-to-sovereign relationship with the United States. This formal political recognition, however, did not include the Chiricahua Apache. At least since 1886, the United States has not considered the Chiricahua a separate, independent Native American tribe.

This all means, of course, that nothing Saenz presents to the government can establish to the government's satisfaction that he is genuinely Indian. Even though the Bald and Golden Eagle Protection Act allows for possession of eagle feathers in conjunction with "the religious purposes of Indian tribes,"16 U.S.C. 668a, and even though Saenz has produced credible proof that he is Indian and uses eagle feathers as an essential part of the exercise of an Indian religion, the FWS will not consider his evidence. FWS limits eagle permits to members of "federally recognized" tribes and a Bureau of Indian Affairs' certificate is a mandatory threshold requirement for proof of Indian heritage. Saenz is therefore precluded from applying for an eagle permit, possessing eagle feathers and practicing fundamental tenets of his religion.

This makes the case unlike any other. In other cases where the government has successfully and permanently precluded an individual from possessing eagle feathers for religious purposes, the individual has been characterized as a non-Indian practitioner of a non-traditional religion that may or may not have followed Indian religious practices. While the government in this case repeatedly calls Saenz a non-Indian, I find him genuinely Indian and seeking to practice a genuinely Indian religion. I also find the tribe which the government views as outside its definition of Indian tribe to be historically identifiable as a distinct group "identified as an Indian entity in relationships with Indian tribes or with national, regional, or state Indian organizations," 25 C.F.R. sec. 83.7, and existing as a distinguishable Indian community known "by anthropolo-gists, historians, and/or other scholars." Id. Thus, I have no doubt that Saenz practices an authentic tribal religion consistent with the general religious beliefs of the Chiricahua Apache and that he is a sincere Indian practitioner of that religion who needs eagle feathers as a sacred and fundamental component of his religious expression.

"Orthodoxy is not an issue." <u>Sequoyah v. Tennessee Valley Authority</u>, 620 F.2d 1159, 1163 (6th Cir. 1980). *cert. denied* 449 U.S. 953 (1980). Whether Saenz practices his religion identically to other Chiricahua, past or present, or wholly consistent with the practices of a Mescalero Apache ceremonial dancer or religious practitioner makes no difference. Saenz, as did the religious advocates in <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972), presented in this case for the record a credible history of the Chiricahua and its religious beliefs, the relationship of a belief in the sacred nature of the eagle to more general tenets of Indian religion, the central nature of the eagle to Indian religions and the manner in which the eagle pervades all or most aspects of Indian religious practices. By this Saenz demonstrates his beliefs and practices to be consistent with "the religious purposes of Indian tribes." 16 U.S.C. sec. 668a.

Finally, Saenz has credibly described the impact that a prohibition against ownership of eagle feathers has on his ability to participate in religious and ceremonial dances and the fundamental constraint such a prohibition places on the free expression of his religious beliefs. He has convincingly established that what he puts forward as a need for eagle feathers in the practice of his religion "is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." <u>Wisconsin v. Yoder</u>, <u>supra</u> at 216.

The items seized from Saenz have been inventoried as:

      a.  three eagle feathers,

      b.  one staff with an eagle foot and seven eagle feathers,

      c.  one eagle feather with a beaded shaft,

      d.  one shield with horsehair and four eagle feathers,

e.  one fan with twelve eagle feathers,

　　f.  six eagle feathers tied together with rawhide,

　　g.  one small dream catcher with four generic bird fluffies,

　　h.  one quiver and four arrows with one eagle feather and twelve raptor feathers,

　　i.  one bustle with ninety four eagle feathers and ten fluffies,

　　j.  a framed print with one eagle feather.

Saenz uses these items as essential parts of his Native American religion and his ceremonial dancing; and the eagle feathers seized from him comprised a basic and traditional component of his religious practices. Saenz has not participated in intertribal ceremonies since his eagle feathers were taken from him, and in every likelihood, he will not participate in the future without them. The government's position not only deprives Saenz of the eagle feathers he needs to practice his religion, it also forecloses relevant evidence and every reasonable argument by which Saenz might establish a legitimate claim for their return. Saenz thus suffers irreparable harm and good cause exists for the exercise of equitable jurisdiction. United States v. Deninno, supra at 84; Floyd v. United States, supra at 1002-1003; Clymer v. United States, 164 F.3d 569, 571 (10th Cir. 1999).

The Bald and Golden Eagle Protection Act

The United States holds an obvious and compelling interest in preservation of the bald eagle. In the recent past, if not presently, the bald eagle has been widely regarded as an endangered species. In addition, it is a national symbol. The government also holds a compelling interest in preserving the golden eagle, clearly not endangered, but as an adult so close in appearance to the bald eagle, conservation of the one cannot be secured without special protection of the other.

Eagles, eagle parts and eagle feathers are protected by the Endangered Species Act, 16 U.S. C. sec.1531 *et seq.,* the Migratory Bird Treat Act, 16 U.S.C. sec. 703 *et seq.*, and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. sec. 668 *et seq.* Only the BGEPA is pertinent here. The BGEPA makes it illegal for anyone to

> take, possess, sell, purchase, barter, offer to sell, purchase or
> barter, transport, export or import, at any time or in any manner,
> any bald eagle, commonly known as the American eagle, or any
> golden eagle, alive or dead, or any part, nest, or egg thereof . . .
> 16 U.S.C. sec. 668.

However, the ban is not absolute; it does not always override every other interest.16 U.S. C. sec.668a. The BGEPA expressly allows for the "taking, possession, and transportation" of eagles and eagle parts, including feathers, for certain purposes, when undertaken with permission of the Secretary of the Interior after the Secretary's determination that the particular taking or possession is compatible with the eagle's preservation. 16 U.S.C. sec. 668 and 668a. The statute admits the status of the eagle is secure enough that a total ban on the taking and possession of eagles and eagle parts is not necessary to the specie's ultimate survival and that some uses of the eagle are neither responsible for the eagle's demise nor threaten the government's interest in eagle conservation. See: 64 Fed.Reg. No.128, pp.36453-36464 (July 6,1999); United States v. Dion, 476 U.S. 734 (1986).

The specific instances where the Secretary may allow "taking, possession, and transporta-tion" of eagles and eagle parts are listed as:

> 1. the scientific or exhibition purposes of public museums, scientific societies, and
> zoological parks,
>
> 2. the protection of wildlife or of agricultural or other interests in any particular
> locality, and

3.  the religious purposes of Indian tribes. 16 U.S.C. sec. 6668a.

The Secretary has discretion in each of these categories and exercises that discretion by means of Department of the Interior regulations which create an administrative process for issuance of eagle permits. 50 C.F.R. sec. 22.21-.25.

In referencing the BGEPA's exception for "the religious purposes of Indian tribes," the regulatory scheme translates the statute as a concession to tribal government. This may be one of the legitimate bases of the exception, but is not the only one. While the exception can be read, as argued in this case, as Congress protecting the sovereign-to-sovereign relationship due those Indian tribes the United States has recognized as politically independent, it can also be viewed as Congress (a) recognizing the importance of the eagle to Indian religious practices generally and (b) taking steps not to inhibit the individual free exercise of religion where the eagle is essential to religious expression and total restriction is unnecessary. See: Oversight Hearing Before the Subcomm. on Native American Affairs of the House Comm. on Natural Resources, 103d Congress, lst Sess. 159 (1993); Rupert v. Director, United States Fish and Wildlife Service, 957 F.2d 32 (1st Cir. 1992). Yet, the regulation governing "Permits for Indian religious purposes" strictly limits eagle permits to members of federally-recognized tribes. 50 C.F.R. sec.22.22 (a)(5). In doing so, it addresses only one function of the exception, acknowledging sovereignty, at the expense of the second, respecting the free exercise of religion, and it applies the narrowest of definitions where broader ones could serve better the purposes of the statute.

Defining Indian

Historically, if the federal government designated an Indian tribe a specific reservation and afterward continued a  political relationship with that tribe, the tribe was "recognized" as a

political entity and formally listed by the United States as "an Indian tribe." Western Shoshone Business Council v. Babbitt, 1 F.3d 1052, 1056 (10th Cir. 1993), quoting Felix S. Cohen, Handbook on Federal Indian Law, 6 (1982). This may be a workable means of determining who is Indian where the United States must establish a policy and operating procedures for dispensing federal services and entitlements, granting special protections and subjecting tribal governments to general principles of federal Indian law. See: Western Shoshone Business Council v. Babbitt, supra at 1057, quoting 25 C.F.R. 83. Beyond the need for specific jurisdictional determinations, however, the distinction is not always workable.

Imposition of the government's single and strictly legal definition of "Indian tribe" for all purposes--historical, social, ethnic, religious, political and jurisdictional--conflicts with the reality of human experience. It dictates a very narrow concept and complex criteria where they are not always necessary or applicable. At times, as the present case, both the narrow concept and the uncompromising criteria can be misleading, misdirecting a conclusion to an unreal or unfair result. "The term tribe has no universal legal definition . . . and the question of tribal existence . . (may) depend in part on the context and purposes for which the term is used." Cohen, supra at 3.

The term "recognition" as the government uses it also presents a myriad of problems. "The term 'recognition' has been used in two distinct senses relative to Indian tribes: (1) in the cognitive sense, i.e. that federal officials simply 'know' or 'realize' that an Indian tribe exists, and (2) sometime later, in the jurisdictional sense, i.e. that the federal government formally acknowledges a tribe's existence as a 'domestic dependent nation' with tribal sovereignty and deals with the tribe in a special relationship on a government-to-government basis." William W. Quinn, Jr., "Federal Acknowledgment of American Indian Tribes: Authority, Judicial Interposi-

tion, and 25 C.F.R. Section 83," 17 Am.Indian L.Rev. 37, 38 (1992). In this case, certainly, the United States melds the two uses of the word into one as if there were no difference. Simply by application of the term "not recognized," the United States reasons it has nullified the existence of the Chiricahua Apache, both present and historical, denied its religious practices as Native American, and rendered the Claimant in this case non-Indian.

Yet, neither enforcement of the BGEPA nor conservation of the eagle requires the government's draconian approach. The statute does not define Indian. Its legislative history does not define Indian. The BGEPA makes no mention of federally recognized tribes; and nothing that speaks to Congressional intent suggests such a limitation. Had Congress intended or perceived a need to restrict eagle permits to members of federally-recognized tribes, it obviously could have included the additional language. As the statute reads, it does not set such a limitation and the requirement remains the agency's alone, driven neither by statutory language nor legislative intent. H.R. Rep. No. 87-2, vol. 2 at 3-5 (1962); 87 Cong. Rec. S20339 (Sept. 1, 1962); 87 Cong. Rec. S23369 (Oct. 12, 1962).

This case, then, is unlike the Western Shoshone case where the applicable statute required a "federally-recognized" tribe. Determination of this case need not rest on whether or not the Department of the Interior or FWS politically acknowledges the Chiricahua as an Indian tribe; and the government's legal definition of Indian tribe and its decision not to recognize the Chiricahua Apache can exist apart from this case undisturbed. "The judiciary has historically deferred to executive and legislative determination of tribal recognition." Western Shoshone Business Council v. Babbitt, supra at 1057. Thus, nothing in these findings of fact or conclusions of law is intended to mandate a declaration that the Chiricahua Apache meet the Department of the Interior's legal

13

definition of an independent "recognized" tribe or be declared one.

At the same time, there is also no need for purposes of this case to yield to Interior's strict jurisdictional meaning of the terms Indian and Indian tribe. The Department of Interior cannot be said to have "prescribed procedures and has not been called on to develop special expertise in distinguishing tribes from other groups of Indians." Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 581 (lst Cir. 1979), quoted with approval in Western Shoshone Business Council v. Babbitt, supra at 1057. "Because an Indian community is not recognized by the United States does not necessarily mean that it is not a tribe in an ethnic, autonomous, or other sense." William W. Quinn, Jr., "Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept," 34 Amer.J. Legal Hist. 331, 336 (1990).

> Federal policy toward the recognition of Indian tribes has been by no means consistent with "real" ethnological principles: Congress has frequently consolidated previously distinct groups into a single tribe for recognition purposes, or has divided an individual tribe into two or more groups, recognizing each in turn as a "different" Indian "nation." Congress has also occasionally "terminated" tribes' federal recognition, in some cases only to "restore" it thereafter, and has given the Secretary of the Interior the authority to adjust tribal membership rolls at his own discretion. As one commentator has observed, "it is apparent that the question of whether a tribe has been recognized is resolved without reference to the factual, ethnological characteristics, at the time of decision, of the Indian group involved." Christopher A. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional Law of Tribal Recognition," 73 Denv.U. L.Rev. 141, 156-157 (1995).

In the context of the BGEPA's exemption for "the religious purposes of Indian tribes" and the statute's acknowledgment of the eagle's importance to traditional Indian religions, a cultural, historical and ethnological use of the terms Indian and Indian tribe is appropriate. The BGEPA

does not convey political immunities, does not obligate the United States to special services or benefits, and does not require the delivery of programs or the enforcement of laws limited to Native Americans or "Indian country" and a jurisdictional or political use of words such as recognized, Indian and Indian tribe is unnecessary. Interpreting the meaning of these words in a wider and ethnological sense not only serves the statute's purposes in all respects, it is more apposite the factual setting and the critical issues of the case.

The relevant inquiries for purposes of the BGEPA are solely (1) whether Saenz is genuinely Indian, (2) whether he practices the general tenets of a traditional Indian tribal religion, (3) whether he is a sincere practitioner of that religion, and (4) whether eagle feathers are essential to the expression of that religion. The facts presented establish the Chiricahua to be genuinely Native American and to constitute a "tribe" within the generally accepted historical and ethnological meanings of the word. The facts demonstrate Saenz to be an individual of Chiricahua lineage who sincerely practices a traditional religion and whose Indian heritage constitutes a significant part of his daily life and identity. The government's refusal to find Saenz to be an Indian practicing an Indian religion ignores plain facts, belittles sincere religious beliefs and unreasonably restricts the access to eagle feathers intended by the exception to the BGEPA.

While the government has a legitimate interest in narrowly defining who is Indian and what is an Indian tribe for purposes of distinguishing who is legally eligible for specific government programs and entitlements, the government has no interest in limiting the definition of who is Indian or restricting what is to be considered an Indian tribe for the purpose of determining what is a legitimate religious practice. Whether or not a particular religious practice is sincere, authentically Native American and in accord with tribal beliefs bears no relationship logically or

factually to whether or not the Indian tribe to which the religious practice is attributable has been recognized politically by the United States.

## The Eagle Permit System

The government suggests at least two reasons it must restrict access to eagle permits and it cannot make an exception for Saenz. The first reason is maintaining a manageable (or seemingly manageable) administration of the statutory scheme. The second is preserving both tribal integrity and the exclusivity of Indian religious practices. In either case, the government admits to an administrative scheme intended to further what the government conceives as tribal interests.

To support its arguments that declaring an exception and granting a permit in this case would encourage an unmanageable increase in eagle permit applications and work to the detriment of all federally-recognized tribes, the government extrapolates from census figures pertaining to the number of individuals who consider themselves Native American and assumes, were the system to allow for exceptional circumstances, that all or most of these would immediately apply to own eagle feathers. This is conjecture. FWS supports it only with opinion testimony. The argument, however, is neither persuasive nor good reason to sanction the government's position.

Whether looking at the government's first justification for the present scheme, a manageable process, or the second, support of tribal sovereignty, all the government declares as the interests of federally-recognized tribes seems to be more administrative interests. It appears the Department of Interior and FWS draw a bright line with regard to the issuance of eagle permits only because a bright line makes administrative tasks easier and not because the statute or preserving the eagle or protecting the sovereignty of Indian tribes requires it.

Certainly, consideration of exceptional cases and unusual circumstances in a more open permit process would require additional time and resources. Even so, considering the injustice which can result from not making provision for exceptional cases, the FWS approach is unjustified. Constraint on the free exercise of religion in the name of conserving agency resources stands on very thin ice. The statutory exception itself recognizes the importance of eagles to the free exercise of Indian religion. Yet, in the name of implementing the exception, FWS inhibits precisely what the exception seeks to protect.

Allocations of resources is not an excuse for the inequity the government's position creates. Because it does not have or will not allocate the resources necessary to consider many legitimate claims to eagle feathers, FWS simply forecloses the applications in the first place. Rejecting the most relevant factors and preferring instead a Bureau of Indian Affairs certificate, FWS--without looking at a single other factor--summarily declares Saenz and others "non-Indian" practicing a  non-tribal religion.

To the government restricting access to eagle permits, even legitimate access pursuant to the statute, goes hand in hand with conservation because, the government argues, increased demand for eagle feathers ultimately affects conservation. Whether FWS limits the application process to those who have a Bureau of Indian Affairs certificate or opens it to those who can demonstrate an authentic Indian heritage and the sincere practice of a traditional Indian religion, the executive and the administrative agency stand as gatekeeper. A more open process need not result in a substantial increase in the number of permits granted or the amount of eagle feathers distributed, but were that to occur, so long as the increase results from permits for persons possessing eagle feathers for "the religious purposes of Indian tribes," the additional numbers

result from a fair and anticipated consequence of the statutory provision.

Still, the government stands on its need not only to preclude exceptional cases and circumstances, but also to maintain a restricted system, in general, because the government insists only the latter will preserve tribal integrity. According to the government's arguments in this case, preserving sovereignty and exclusivity in the practice of Indian religions is the second reason supporting its restrictive eagle permit scheme. The government's argument that "the expansion of potential permittees would have a deleterious effect [on] the religious practices of federally recognized tribes" is immaterial. Nothing in the BGEPA protects the generic interests of federally recognized tribes and, even if such a concept as the composite religious interest of federally recognized tribes were to exist, Saenz' individual rights pursuant to the BGEPA, the Religious Freedom Restoration Act and the First Amendment cannot be sacrificed to vague and general propositions.

It is ironic that the Department of the Interior, as argued in this case, has contrived an eagle permit system directed solely at benefitting tribal governments only to have tribal governments openly dissatisfied with it from its inception. Clearly, the eagle permit system has long been a subject of criticism. See, e.g.: Francis X. Santangelo, "A Proposal for the Equal Protection of Non-Indians Practicing Native American Religions: Can the Religious Freedom Restoration Act Finally Remove the Existing Deference Without a Difference?" 1995 St. John's L Rev. 255; Antonia M. DeMeo, "Access to Eagles and Eagle Parts: Environmental Protection v. Native Free Exercise of Religion," Spring 1995 Hastings Const.L.Q. 772; United States v. Abeyta, 632 F. Supp.1301 (D.N.M.1986); United States v. Gonzales, 957 F. Supp. 1225 (D.N.M.1997). "Native Americans criticize the system because of the 1) long processing delays;

2) poor condition of eagles received; 3) lack of processing priorities; 4) governmental failure to acknowledge Indian sovereignty; and 5) general governmental insensitivity toward Native American religion." Id. at 789. Of these, long time delays with no accommodation for urgent need or emergency processing is the most pervasive of the complaints. Id. Testimony in this case indicated an eagle permit requires up to three years to process with 45,000 applications pending at any point in time.

Without providing any reasons for such a delay, explaining how a backlog occurred or specifying what departmental resources have been or are now dedicated to processing eagle permits, the government takes the position that a nearly unmanageable permit process strongly justifies not opening it to applicants who are "non-Indian" (meaning anyone not a member of a federally-recognized tribe), because additional requests would delay the processing of applications from members of federally-recognized tribes and do an injustice to those sovereign-to-sovereign relationships to which the United States is committed.

Nothing in the legislative history suggests a concern that the United States use the statute to pay homage to tribal government, to aid tribes in maintaining exclusively Indian religions free of non-Indian practitioners, or to aid federally-recognized tribes in inhibiting non-recognized tribes in certain religious practices. The BGEPA's legislative history indicates the intent of the BGEPA is specifically and singularly to save the eagle from extinction. 87 Cong. Rec. S20339 (Sept. 1, 1962).

The exception in the BGEPA "for the religious purposes of Indian tribes" was not added to the law until twenty-two years after the original Eagle Protection Act was passed. United States v. Dion, supra at 740. The exception was formally recommended by the Department of the

Interior in a statement by Frank P. Briggs, who in 1962 was an Assistant Secretary. Id. at 741-742. Briggs recommends the exception expressly because many tribes, "particularly those in the Southwest," have continued in "ancient customs and ceremonies that are of deep religious or emotional significance to them," and not because of any stated obligation to preserve tribal religion or support the sovereignty of federally-recognized tribes. Id. at 741; H.R. Rep. No. 87-2, vol. 2 at 4. "At the Senate hearings, representatives of the Interior Department reiterated their position that, because 'the golden eagle is an important part of the ceremonies and religion of many Indian tribes,' the Secretary should be authorized to allow the use of eagles for religious purposes by Indian tribes." United States v. Dion, supra at 743.

In the end, it appears the present permit system is designed not to enhance the government's position with federally-recognized tribes, to serve tribe's governmental purposes, to implement the statutory exception in the fairest manner possible, or to place the least constraint on the free exercise of religion; the present permit systems appears designed to minimize the work Congress has handed the agency. Administrative expediency, however, does not constitute a compelling governmental interest that justifies either intrusion into religious beliefs or regula-tions which unreasonably restrict express statutory provisions. None of what the government presents in this case justifies denying an Indian practitioner of an Indian tribal religion access to eagle feathers. Denying Saenz all possibility of obtaining an eagle permit is not tailored to serve governmental interests which are compelling, including conservation of the eagle.

<u>The Religious Freedom Restoration Act</u>

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. sec. 2000bb-2000bb-4, allows the free expression of religion to be substantially burdened and bona fide religious practices

to be constrained by the federal government only if the government can establish (a) that the burden applied furthers a compelling governmental interest and (b) constitutes the least restrictive means of furthering that governmental interest. 42 U.S.C. sec. 2000bb-2000bb-4.

The government in this case proposes several compelling interests. First, of course, it cites "protecting eagle populations." The government fails, however, to provide any evidence that this interest (1) is furthered by foreclosing the eagle permit process to Native Americans who are sincerely practicing a traditional Indian religion, but are not members of a federally-recognized tribe, or (2) is diminished by issuing a permit to a Native American who needs eagle feathers for traditional Indian religious practices, but who is not a member of federally-recognized tribe. While the compelling interest is undisputed, the chosen means of furthering that interest is neither established as necessary nor demonstrated to be "the least restrictive."

The government also claims "a compelling interest in preserving Indian religious practices by limiting the scarce supply of eagle feathers and parts to the religious practices of members of federally recognized tribes." While this sounds dangerously like government suggesting it holds a proper place in the support of some religions over others, the government cites Rupert v. Director, United States Fish and Wildlife Service, supra.

The government misreads the case. In Rupert, the applicant for eagle feathers was non-Indian and the tribe was one that the plaintiff had recently created himself. Id. at 33. "It is clear," stated the court, "that Mr. Rupert does not descend from Native Americans and is not a member of any officially recognized Native American tribe." Id. The issue, addressed in the case on constitutional grounds, was whether the eagle permit regulation could prefer Indian applicants who practiced a *bona fide* Indian religion. Id. While the circuit court held that it could, the

21

decision has little import to the case at hand. And even though the <u>Rupert</u> opinion endorses a compelling interest "in preserving Indian religious practices," it does not position one Indian religion against another. The case therefore lends nothing to the present case where the Claimant professes to be an Indian who practices a *bona fide* Indian religion, and the government presents nothing to the contrary.

The government argues a compelling interest in preserving and supporting the "unique legal status" of Indian tribes "based on a history of treaties and the assumption of a 'guardian-ward status . . . " Here the United States cites <u>Morton v. Mancari</u>. Yet, the government's several arguments referring to a duty to tribal government and a need to acknowledge tribal sovereignty are out of place. The issue to be decided is not the legitimacy of sovereign-to-sovereign relationships. This is an end only tangentially tied to the BGEPA in the first place. The ultimate issue in this case centers on the rights of an individual, not as against tribal governments, but as against the United States. Any reliance on <u>Morton v. Mancari</u> is therefore extraneous.

Similarly, the government's argument of a compelling interest in "[e]nsuring that members of federally recognized Indian tribes continue to have access to eagle feathers" goes beyond the issue. Except for its problems with administering the program, which are real and apparent, but also escapable and not compelling, the government proposes no explanation why issuance of eagle permits must be limited to Native Americans who belong to federally-recognized tribes when the statute itself, while it easily could have, does not place such a restriction on possession of eagle feathers for "religious purposes" and simply requires a sincere Native American religious practitioner.

Lastly, the government argues a compelling interest in "avoidance of interference in Indian

tribal religious practices and customs, which are deeply embedded in the history and culture of this country." Once more the United States appears to rely on <u>Morton v. Mancari</u>, <u>supra</u>. Again, the holding in <u>Mancari</u> is beside the point. The government argues that: "The unique government-to-government relationship between the United States and federally recognized Indian tribes empowers Congress to pass legislation that treats tribes differently from other groups of citizens." The point is not disputed. It also does not relate to the issues in this case. If the exception of the BGEPA encompasses individual Native American religious practitioners, it is not because of any government-to-government relationship between the United States and federally-recognized Indian tribes. It is because the BGEPA can and should be enforced with accommodation for individual Native Americans, like Saenz, who practice a traditional Indian religion and consider eagle feathers indispensable to that practice.

The government is left, then, with one compelling interest, preservation of bald and golden eagles; and it justifies the means of furthering that interest on two propositions. The government maintains that it cannot allow Native Americans who are members of non-recognized Indian tribes access to eagle permits because (1) the resulting demands on the administrative system and available eagle parts would deprive or at least diminish access to eagle parts for members of federally-recognized tribes, and (2) the government's obligation is solely to federally-recognized tribes to the exclusion of all others seeking eagle feathers, regardless of their standing or their claims.

The first premise is an administrative problem and the second, except politically, remains unsupported. Together these premises fail to settle the issues in this case because the government has yet to find "the least restrictive means" of furthering its interest in the conservation of eagles.

FWS cannot restrict the eagle permit process for the real reason of controlling the agency's workload or allocating the agency's resources other directions and then claim that the consequences to the free exercise of religion are simply unavoidable, or worse, that the consequences result from "avoidance of interference in Indian tribal religious practices and customs."

In many respects, what the government proposes as justification for its eagle permit regulations does not address the interests of conservation at all. In all respects, the government's approach makes no attempt to accommodate the right of an individual to the free exercise of religion or to recognize the fundamental nature of the eagle to *all* Native Americans who practice a traditional Indian religion. At best, the eagle permit scheme is not "the least restrictive means" to the necessary end. At worse, it may not be a means to any legitimate end. It fails to take into account mandatory considerations. It constrains the free exercise of religion without cause and it violates the Religious Freedom Restoration Act.

Relying on administrative necessity will not in any circumstance meet the government's burden when the government is actively constraining the free exercise of religion. Whether or not sufficient eagle parts are available to the permit process has been argued or proposed in testimony, but not convincingly, and certainly not from a factual basis. The issue may well be another result of administrative problems. Administration and policy can be changed. To improve the delivery system for permits and the availability of eagle parts both, FWS might resort, as tribes have repeatedly suggested, to a system of tribal allocations or tribal permits, with FWS taking up only exceptional cases such as the one at issue. Hastings Const.L.Q., supra at 793. The government's evidence provides little basis for determining how real is the issue of increased applications or what FWS has done to develop a process that can quickly sort through frivolous

requests. Are there large numbers of persons in the same situation as Saenz? If this is the government's argument, that the numbers are so large the agency would be overwhelmed, it is not an answer, it is a significant problem. If the situation is truly a dearth of eagles, parts and feathers to distribute after an application is approved, the system needs reexamination and new rules. In either case, to simplify the government's task by declaring some Indian practitioners qualified and some not by a means as unrelated to religious practices as whether or not the federal government has granted political status to a tribal government completely disregards the individual right to practice one's religion without unnecessary governmental constraint.

In the context of honoring "religious practices and customs, which are deeply embedded in the history and culture of this country," the government has no compelling interest in preferring the practices of any one Indian tribe over another on the basis of unrelated distinctions in political status. The federal government may find it difficult, time-consuming or bothersome to identify authentic Indian tribes ethnologically rather than simply politically, but the present test will never provide for the individual free exercise of religion precisely because of cases like the present one and because whether or not a particular tribe has been formally recognized for political purposes bears no relationship whatsoever to whether or not an individual practitioner is of Indian heritage by birth, sincerely holds and practices traditional Indian religious beliefs, is dependent on eagle feathers for the expression of those beliefs, and is substantially burdened when prohibited from possessing eagle parts.

A prima facie case under this RFRA requires (a) a demonstration that government actions have placed a substantial burden on an individual's religious practices, (b) that the practices the government burdens are grounded in religious beliefs and not simply in a philosophy or way of

life, and (c) that the religious practices burdened are sincerely held. <u>United States v. Meyers</u>, 95 F.3d 1475, 1482 (10th Cir. 1996). "To exceed the 'substantial burden' threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet" of an individual's religious beliefs, "meaningfully curtail" an individual's ability to express adherence to his or her beliefs, or deny an individual's "reasonable opportunity to engage in those activities that are fundamental" to his or her religion. <u>Werner v. McCotter</u>, 49 F.3d 1476, 1480 (10th Cir. 1995).

Clearly, Saenz has met all of these standards by credible evidence and is not to be dismissed in his claims merely because the government has summarily declared him to be "non-Indian." The RFRA requires more than a cursory review. FWS retains Saenz eagle feathers without good reason, and not because of the BGEPA, but in spite of it. The government's actions in this case, and in general, with regard to foreclosing Native American practitioners of Indian tribal religions from applying for eagle permits do not arise from a narrowly tailored plan to further a compelling governmental interest. Further, as a direct result of the government's failure to give any weight or consideration to the authenticity or sincerity of Saenz religious beliefs, the government has substantially burdened Saenz' ability to practice core aspects of his religion.

<u>Providing an Equitable Remedy</u>

The government demonstrates no compelling interest in retaining the eagle feathers at issue; and returning the eagle feathers to Saenz will cause the government no harm. A return is highly unlikely to contribute to any further decline of bald and golden eagles or to diminish conservation efforts on their behalf. In addition, Saenz testified the eagle feathers were gifts and

all came from Canada and Alaska. They are of unknown date and origin and some may pre-date passage of the BGEPA. Nothing indicates Saenz has killed eagles or that the eagle feathers seized from him were collected by illegal, questionable or clandestine means. No evidence presented by the government demonstrates that return of the eagle feathers to Saenz would make any difference to the practice of Indian religions, in general, or the religion of other Apache, in particular.

Even if conservation of the eagle is seen to constitute a compelling governmental interest not "in equipoise" with the right of individual Native Americans to practice their religion, as the court in Rupert found it, but superior to individual religious rights, retention of Saenz' eagle feathers places a substantial, unreasonable and unnecessary burden on the free exercise of his religion. It does not constitute the least restrictive means of furthering the government's interests and does nothing to promote conservation of the eagle or further enforcement of the BGEPA. Returning Saenz' property to him, on the other hand, will allow him the free exercise of his religious beliefs which he cannot otherwise enjoy.

Weighing the equities and considering the law and all of the facts, the only fair and just resolution of this case is to return to Saenz the eagle feathers seized from him and to allow for his permanent ownership and possession.

NOW, THEREFORE, IT IS ORDERED that the United States' Motion to Treat the Claimant's Rule 41 Motion as a Civil Complaint is denied; and

IT IS FURTHER ORDERED that the Claimant's Motion for Return of Property Seized

by Search Warrant is granted, with a separate judgment and order entered directing the United States to make immediate return of the Claimant's eagle feathers and all related items.

_____
SENIOR UNITED STATES JUDGE